*RECOMMENDED FOR FULL-TEXT PUBLICATION*
Pursuant to Sixth Circuit Rule 206

File Name: 09a0081p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

_____



WILLIAM GARNER,

    *Petitioner-Appellant,*

  *v.*

BETTY MITCHELL, Warden,

     *Respondent-Appellee.*

No. 02-3552

Appeal from the United States District Court
for the Southern District of Ohio at Columbus.
No. 98-00870—James L. Graham, District Judge.

Argued: June 4, 2008

Decided and Filed: March 3, 2009

Before: BOGGS, Chief Judge; MARTIN, BATCHELDER, DAUGHTREY, MOORE, COLE, CLAY, GILMAN, GIBBONS, ROGERS, SUTTON, McKEAGUE, and GRIFFIN, Circuit Judges.[*]

_____

## COUNSEL

**ARGUED:** Kelly L. Schneider, OHIO PUBLIC DEFENDER'S OFFICE, Columbus, Ohio, for Appellant. Benjamin C. Mizer, OFFICE OF THE OHIO ATTORNEY GENERAL, Columbus, Ohio, for Appellee. **ON BRIEF:** Kelly L. Schneider, OHIO PUBLIC DEFENDER'S OFFICE, Columbus, Ohio, Kyle E. Timken, LAW OFFICE, Columbus, Ohio, for Appellant. Benjamin C. Mizer, William P. Marshall, Jonathan R. Fulkerson, Charles L. Wille, OFFICE OF THE OHIO ATTORNEY GENERAL, Columbus, Ohio, for Appellee.

  ROGERS, J., delivered the opinion of the court, in which BOGGS, C. J., BATCHELDER, GILMAN, GIBBONS, SUTTON, McKEAGUE, and GRIFFIN, JJ., joined. DAUGHTREY, J. (pp. 22–24), delivered a separate opinion concurring in result only. COLE, J. (p. 25), delivered a separate opinion concurring in part and dissenting in part. MOORE, J. (pp. 26–43), delivered a separate dissenting opinion, in which MARTIN and CLAY, JJ., joined.

_____

[*]Judge Cook took no part in the consideration or decision of this case.

1

———————————

**OPINION**

———————————

ROGERS, Circuit Judge.  Habeas corpus relief was properly denied in this case because William Garner validly waived his *Miranda* rights, notwithstanding expert testimony—based in part on a test administered six years later—to the effect that Garner mentally could not have sufficiently understood the scope of what *Miranda* protects.  In 1992, Garner burglarized and set fire to an apartment in Cincinnati, Ohio, killing five children who he knew were sleeping inside.  After he was arrested and advised of his *Miranda* rights, Garner agreed to speak with police officers and confessed on tape to setting the fire.  The confession was admitted at trial and Garner was eventually convicted by a jury on, among other charges, five counts of aggravated murder, and sentenced to death.  The Ohio state courts affirmed Garner's convictions and sentence on direct and collateral review, and Garner filed this 28 U.S.C. § 2254 action in federal district court, raising twenty-three grounds for relief.  The district court denied Garner's habeas petition on all twenty-three grounds, and Garner now raises four grounds on appeal, three of which relate to the *Miranda* waiver.  Because the record shows that Garner knowingly and intelligently waived his *Miranda* rights before he confessed to his crimes, and because Garner's other claims lack merit, Garner is not entitled to habeas relief.

I.

On January 25, 1992, Addie F. Mack visited a local hospital emergency room in Cincinnati, Ohio for treatment.  While in the hospital waiting area, Mack called her son to update him on her status, and accidentally left her purse unattended by the pay telephone. Defendant Garner took the purse and removed Mack's keys, driver's license, and wallet.  Using the address listed on Mack's driver's license, Garner directed a taxicab to Mack's apartment at 1969 Knob Court.  When the taxicab arrived at the apartment, Garner asked the driver, Thomas J. Tolliver, to wait while Garner went

inside. Garner provided Tolliver with Mack's wallet as collateral for payment of the cab fare.

Using the keys found in Mack's purse, Garner entered the apartment and noticed four girls sleeping in one bedroom and two boys sleeping in a second bedroom. The children ranged from ten to thirteen years of age. At one point, one of the girls woke up and asked Garner for a glass of water. Garner provided her with water, and the girl watched television for a short time before going back to sleep. Garner carried several items from the apartment to the taxicab, including a VCR, television set, portable telephone, and a "boom box" radio. As he brought the items to the taxicab, Garner explained to Tolliver that he was removing the items because his girlfriend "threw him out" during a fight.

After removing the stolen property, Garner returned to the apartment and set three fires, two in upstairs bedrooms and one on a couch in the living room. Although the two upstairs fires smoldered and eventually went out, the couch fire completely destroyed the contents of the living room and filled the entire apartment with heavy smoke. Mack's oldest child awoke during the fire and was able to escape through a window. The five other children died of smoke inhalation. Upon leaving the apartment, Garner instructed Tolliver to take him to a convenience store, where Garner purchased snacks. The pair then drove to Garner's home at 3250 Burnet Avenue. Tolliver helped Garner carry the stolen items into Garner's home and accepted Mack's television set as payment for the cab fare.

During the investigation of the fire, the police located Tolliver based on information provided by two officers who had observed a person loading items into a taxicab near Mack's apartment shortly before the fire was reported. Tolliver told the officers that he picked up Garner at the hospital emergency room, drove to 1969 Knob Court, and waited outside while Garner entered the apartment and brought several items to the taxicab. Tolliver stated that, thereafter, he drove Garner to the convenience store and then to 3250 Burnet Avenue. After police presented to Tolliver still photographs generated from surveillance video taken at the convenience store, Tolliver identified

Garner based on Garner's clothing. Tolliver also identified Garner in two photo arrays that included Garner's photograph, and officers recovered from Tolliver Mack's television set.

Based on the information provided by Tolliver, police obtained a search warrant and searched Garner's Burnet Avenue residence. Officers recovered several items that matched the descriptions given by Tolliver, including a VCR, "boom box" radio, and portable telephone. Officers also recovered Mack's keys and copies of Mack's children's birth certificates. During the search, officers arrested Garner and advised him of his *Miranda* rights. Garner was transported to police headquarters, where he was again advised of his *Miranda* rights and presented with a waiver form. Garner agreed to waive his *Miranda* rights and provided a taped statement recounting the events described above.

In the taped statement, Garner admitted finding Mack's purse and to taking a taxicab to Mack's apartment with the intent to "take her things." Garner stated that he noticed the children sleeping in the apartment and admitted carrying a number of items from the apartment to the taxicab. Garner confirmed having watched the couch catch fire and explained that he started the fire to cover fingerprints that he had left on the couch. Garner told officers that he believed that the children would smell the smoke and leave the apartment because one child had already been awake and because all of the children were old enough to escape.

On February 3, 1992, Garner was indicted and charged with five counts of aggravated murder, each with three death penalty specifications, one count of aggravated burglary, two counts of aggravated arson, one count of theft, and one count of receiving stolen property. Garner pleaded no contest to the theft and receipt-of-stolen-property counts, and the trial court found him guilty on those counts. On October 1, 1992, the jury convicted Garner on the remaining counts and specifications. Following a sentencing hearing, the jury recommended imposition of the death sentence. The state trial court accepted the jury's recommendation and sentenced Garner to death on the aggravated murder counts and to consecutive terms of imprisonment on all other counts.

On direct review in state court, Garner raised twenty-three assignments of error. The Ohio Court of Appeals and Ohio Supreme Court both affirmed Garner's convictions and sentence, *State v. Garner*, No. C-920864, 1994 WL 466508 (Ohio Ct. App. Aug. 31, 1994); *State v. Garner*, 656 N.E.2d 623 (Ohio 1995)*,* and the United States Supreme Court denied certiorari, *Garner v. Ohio*, 517 U.S. 1147 (1996).  Thereafter, Garner filed two petitions for post-conviction relief in state court.  Both petitions were denied by the state trial court, and the denials were affirmed by the state court of appeals.  *State v. Garner*, No. C-960995, 1997 WL 778982 (Ohio Ct. App. Dec. 19, 1997); *State v. Garner*, No. C-990659, 2000 WL 492074 (Ohio Ct. App. Apr. 28, 2000).  The Ohio Supreme Court declined to exercise jurisdiction to hear both cases.  *State v. Garner*, 691 N.E.2d 1058 (Ohio 1998); *State v. Garner*, 734 N.E.2d 835 (Ohio 2000).

On November 18, 1998, Garner filed a petition for a writ of habeas corpus in federal district court, raising twenty-three grounds for relief.  The district court ultimately denied all of Garner's claims and dismissed the petition.  The district court granted Garner a certificate of appealability on three related claims: (1) that Garner did not knowingly and intelligently waive his *Miranda* rights before speaking with police; (2) that Garner's state trial counsel were ineffective for failing to investigate and argue his *Miranda* claims; and (3) that the state trial court erred by not providing Garner with experts to assist with his *Miranda* claim.  After Garner filed a notice of appeal, this court issued him a certificate of appealability on a fourth claim: that the process by which the petit jury venire was selected discriminated against African-Americans.

## II.

### A.

The record indicates that Garner knowingly and intelligently waived his *Miranda* rights, and Garner is therefore not entitled to habeas relief on his *Miranda* claim. Notwithstanding Garner's failure to exhaust this claim in the state courts, 28 U.S.C. § 2254 permits us to deny his application on the merits.

The totality of the circumstances in this case shows that Garner's waiver was knowing and intelligent. Garner has the burden of establishing that, under the totality of the circumstances, he did not knowingly and intelligently waive his rights before speaking to the police. *Clark v. Mitchell*, 425 F.3d 270, 283 (6th Cir. 2005). "We are also mindful that in a habeas proceeding the petitioner 'has the burden of establishing his right to federal habeas relief . . . .'" *Caver v. Straub*, 349 F.3d 340, 351 (6th Cir. 2003) (quoting *Romine v. Head*, 253 F.3d 1349, 1357 (11th Cir. 2001)). Under this inquiry, we examine "the particular facts and circumstances surrounding [the] case, including the background, experience, and conduct of the accused." *Johnson v. Zerbst*, 304 U.S. 458, 464 (1938); *see also Edwards v. Arizona*, 451 U.S. 477, 482 (1981). The relevant question is not whether the "criminal suspect [knew] and [understood] every possible consequence of a waiver of the Fifth Amendment privilege," but rather whether the "suspect [knew] that he [could] choose not to talk to law enforcement officers, to talk only with counsel present, or to discontinue talking at any time." *Colorado v. Spring*, 479 U.S. 564, 574 (1987).

Here, Garner's conduct before and during the interrogation demonstrates that he understood his *Miranda* rights and the consequences of waiving those rights. Contemporaneous evidence in the record indicates that Garner appeared "perfectly normal" and "very coherent" at the time that he waived his rights and confessed to his crimes. Officers read Garner the *Miranda* warnings at least two times before he confessed, and Garner signed and dated a form expressly waiving his rights. It is undisputed that the police officers took care to ensure that Garner understood the warnings and waiver before he signed the form. Officer Feldhaus of the Cincinnati Police Department testified that after reading each provision of the *Miranda* warnings to Garner, he asked Garner if he understood the meaning of that provision. Each time that he was asked, Garner responded that he understood his rights, including the waiver provision. Further, nothing in the record indicates that Garner verbally expressed a misunderstanding to police officers or otherwise engaged in conduct indicative of a misunderstanding.

Garner's explanation of his conduct during the commission of his crimes moreover served to confirm his capacity to understand the *Miranda* warnings. While transferring the stolen items from Mack's apartment to the taxicab, Garner explained to Tolliver that his girlfriend "threw him out," thus necessitating the removal of his personal belongings. Garner also explained to police that he started the couch fire to rid the couch of any fingerprints that he may have left. Both of these statements indicate that Garner had the capacity to understand the criminal nature of his actions and the consequences of those actions. That Garner had this capacity at the time that he committed the crimes suggests that, when questioned about those crimes on the next day, Garner also had the capacity to understand and appreciate the consequences of speaking to police about his criminal conduct. We have held, in the similar context of a challenge to the voluntariness of a confession, that a defendant's capacity to devise a criminal scheme was evidence of capacity to admit to devising the scheme. *United States v. Macklin*, 900 F.2d 948, 952 (6th Cir. 1990); *see also United States v. Turner*, 157 F.3d 552, 555 (8th Cir. 1998) (holding that defendant with low IQ knowingly waived his rights and noting that, at the time that defendant was stopped by police, defendant acted "in a manner more consistent with a person attempting to avoid being caught than a person who did not know what he was doing"); *United States v. Solano-Godines*, No. 96-10255, 1997 WL 407861, at *3 (9th Cir. July 21, 1997) (holding that waiver was knowing and intelligent where defendant "understood everything else that was going on throughout the day" and made up a "clever story that he was framed"). Accordingly, all evidence in the record of Garner's conduct during, and leading up to, the interrogation indicates that Garner had the capacity to waive his *Miranda* rights knowingly and intelligently.

It follows from the above that, at the time of the interrogation, police officers had no indication that Garner's "age, experience, education, background, and intelligence" may have prevented him from understanding the *Miranda* warnings. *See Fare v. Michael C.*, 442 U.S. 707, 725 (1979). As discussed, Garner appeared "perfectly normal" and "very coherent" to the interrogating officers. Moreover, in a competency report prepared prior to trial, Dr. Nancy Schmidtgoessling, a clinical psychologist, stated that Garner "appeared to be of near average intelligence by observation," "appeared to be able to understand all questions and material presented to him," and that "his expressive language abilities were intact." Accordingly, even if Garner's mental capacity, background, age, and experience did somehow prevent him from actually understanding the *Miranda* warnings—and the evidence indicates that they did not—the officers questioning Garner had no way to discern the misunderstanding in Garner's mind. This is of primary significance given the original purpose underlying the *Miranda* decision, which was to "reduce the likelihood that the suspects would fall victim to constitutionally impermissible practices of police interrogation." *New York v. Quarles*, 467 U.S. 649, 656 (1984). As the Seventh Circuit explained in a thoughtful opinion:

> The relevant constitutional principles are aimed not at protecting people from themselves but at curbing abusive practices by public officers. . . . [T]he knowledge of the police is vital. If they have no reason (there was none in [*Colorado v.*] *Connelly*, see 479 U.S. [157, 161-62 (1986)]) to think that the suspect doesn't understand them, there is nothing that smacks of abusive behavior. It would seem to follow that the question is not whether if [the defendant] were more intelligent, informed, balanced, and so forth he would not have waived his *Miranda* rights, but whether the police believed he understood their explanation of those rights; more precisely, whether a reasonable state court judge could have found that the police believed this.

*Rice v. Cooper*, 148 F.3d 747, 750-51 (7th Cir. 1998).[1]  This analysis is fully consistent

with *Moran v. Burbine*, 475 U.S. 412 (1986), which explained that the *Miranda* waiver

inquiry had two dimensions: voluntariness and comprehension.  475 U.S. at 421.  At no

point did the Supreme Court say that one of the two dimensions is to be examined from

the perspective of the police while the other is to be examined from the perspective of

later scientific inquiry.  Instead, both are to be evaluated from the "totality of the

circumstances surrounding the interrogation."  *Id.* (quoting *Fare*, 442 U.S. at 725).  The

underlying police-regulatory purpose of *Miranda* compels that these circumstances be

examined, in their totality, primarily from the perspective of the police.  Because police

had no reason to believe that Garner misunderstood the warnings, and because it is

undisputed that the officers were otherwise reasonable and careful in giving the warnings

and obtaining the confession, there is no basis for invalidating Garner's *Miranda* waiver.

## B.

Of course, while our primary focus must remain on what the interrogating

officers could have concluded about Garner's ability to understand the warnings, we may

consider later-developed evidence of a defendant's actual mental ability to understand

the warnings at the time of the interrogation.  This is because, if it turns out by

subsequent inquiry that a defendant in his mind could not actually understand the

---

[1]This analysis of course does not mean that the police can disregard signs or even hints that an interrogation suspect does not understand.  As the Seventh Circuit explained in *Rice*,

> it might be argued that officers are free to recite the standard *Miranda* warnings to anyone they arrest, regardless of the person's evident mental condition, and to accept the person's waiver.  But this has to be wrong, though we cannot find a case that says so.  If the suspect is a small child, or if it is apparent that he cannot speak English, then attempting to extract a waiver of *Miranda* rights is pretty obviously an abusive practice, as it is a calculated, conscious effort to extract a decision that is not the product of a rational choice.  And likewise if it is apparent that because of illness, insanity, or mental retardation the suspect is incapable of rationally waiving his *Miranda* rights. The significance of the principle of *Connelly*, the principle that the Constitution doesn't protect the suspect against himself, is that if he understands the *Miranda* warnings yet is moved by a crazy impulse to blurt out a confession, the confession is admissible because it is not a product of coercion. The police have given him his *Miranda* warnings in an intelligible form; it is not their fault that he is impulsive. It is different, if perhaps only by a shade, if the police question him knowing that he does not understand his rights.

148 F.3d at 750.  Thus it would be impossible to read our holding today as suggesting that "a deaf defendant could give a knowing and intelligent waiver when he is given only a mumbled *Miranda* warning." (Dissent at 27).

warnings, the finder of fact may be more inclined to determine in a close case that the police should have known that the defendant could not understand. Here, however, evidence in the record of Garner's age, experience, education, background, and intelligence does not mandate the conclusion that, even viewed from his internal perspective, Garner could not understand the *Miranda* warnings. At the time of the waiver, Garner was nineteen years of age. It is undisputed that he had a troubled upbringing, poor education, and that his IQ of 76 placed him in the "borderline range of intelligence." Testimony during the mitigation hearing indicated that Garner endured physical and sexual abuse at the hands of his family members. Garner and his siblings were often left alone to fend for themselves, and Garner did not perform well in school.

Dr. Jeffrey Smalldon, a clinical psychology expert, concluded in an affidavit prepared for the penalty phase of Garner's trial that Garner's "borderline intelligence, functional (i.e., organic) brain impairment, abusive and socially depraved background, and long history of impulsivity raise serious questions as to whether he could or did understand the consequences of signing the 'Waiver of Rights.'" Dr. Smalldon acknowledged, however, that his assessment suffered from limitations and that a "[m]ore focused assessment would provide better, and perhaps even conclusive, information on this issue."

In her competency report, Dr. Schmidtgoessling similarly noted that Garner had a long history of hyperactivity and impulsivity, and was "functioning in the borderline range" of intelligence. Even so, upon observing Garner, Dr. Schmidtgoessling remarked that Garner "appeared to be of near average intelligence" and "appeared to be able to understand all questions and material presented to him suggesting that his receptive language is intact." Dr. Schmidtgoessling concluded that Garner was "familiar with the specifics of the allegations against him" and "was able to give a coherent, realistic account of his behavior relevant to the allegations although his account differed in a couple of major respects . . . from the statement made to police." Schmidtgoessling wrote that Garner understood the roles of the various court personnel, was able to

identify his attorneys by name, and defined his attorneys' job as "to speak up for you, argue for you, defend you."

Additionally, Dr. Schmidtgoessling administered various psychological tests in assessing Garner's competency to stand trial. Garner received an average score on a memory test, and a low average score on a test that measured his nonverbal problem-solving abilities. Garner scored within normal limits on a screening test for perceptual motor functions, in the superior range (90th percentile) on the simple Trail Making Test, and well below average (below the 10th percentile) on a more complex Trail Making Test. Dr. Schmidtgoessling testified that the Trail Making Test is "a special kind of test that's very strong in detecting organic [brain] impairment." In her report, Dr. Schmidtgoessling concluded that "there are no indications of major mental illness although the question of some sort of organic impairment remains open."

During federal habeas proceedings, the district court granted Garner's motion to expand the record to include an affidavit and report submitted by Dr. Caroline Everington.[2] Like Drs. Smalldon and Schmidtgoessling, Dr. Everington concluded that Garner's IQ test scores placed him in the "borderline range of intellectual functioning," and that psychological reports, social history, and school records indicated that Garner had "intellectual problems during the developmental period" and "difficulties in academic and adaptive functioning." Dr. Everington's report also assessed Garner's abilities to comprehend the *Miranda* warnings during his interrogation, and relied heavily on her administration of the so-called Grisso test, discussed more extensively below.

The assessments of Drs. Smalldon, Schmidtgoessling, and Everington indicate that Garner suffered from diminished mental capacity, a troubled upbringing, and a poor education at the time that he confessed to his crimes. These assessments do not demonstrate, however, that Garner was incapable of knowingly and intelligently waiving

---

[2]Because the district court concluded that Dr. Everington's assessments did not warrant further evidentiary hearings, it did not give the state the opportunity either to cross-examine Dr. Everington or to introduce expert evidence to counter her conclusions.

his *Miranda* rights. It is well-established, in this circuit and others, that mental capacity is one of many factors to be considered in the totality of the circumstances analysis regarding whether a *Miranda* waiver was knowing and intelligent. Thus, diminished mental capacity alone does not prevent a defendant from validly waiving his or her *Miranda* rights. *See Clark*, 425 F.3d at 283-84; *Finley v. Rogers*, 116 F. App'x 630, 636-38 (6th Cir. 2004); *United States v. Rojas-Tapia*, 446 F.3d 1, 7-9 (1st Cir. 2006); *Smith v. Mullin*, 379 F.3d 919, 933-34 (10th Cir. 2004); *Young v. Walls*, 311 F.3d 846, 849 (7th Cir. 2002); *Turner*, 157 F.3d at 555-56; *Rice*, 148 F.3d at 750; *Henderson v. DeTella*, 97 F.3d 942, 948-49 (7th Cir. 1996); *Correll v. Thompson*, 63 F.3d 1279, 1288 (4th Cir. 1995); *Starr v. Lockhart*, 23 F.3d 1280, 1294 (8th Cir. 1994); *Derrick v. Peterson*, 924 F.2d 813, 824 (9th Cir. 1991); *Toste v. Lopes*, 861 F.2d 782, 783 (2d Cir. 1988); *Dunkins v. Thigpen*, 854 F.2d 394, 399-400 (11th Cir. 1988). Rather, that factor must be viewed alongside other factors, including evidence of the defendant's conduct during, and leading up to, the interrogation.

Case law in other circuits is instructive in this regard. For example, in *Smith v. Mullin*, the Tenth Circuit held that the defendant's *Miranda* waiver was knowing and intelligent despite the facts that (1) the defendant suffered from borderline mental retardation, and (2) a clinical psychologist had concluded, based on the defendant's Grisso test scores, that the defendant could not have validly waived his rights. 379 F.3d at 932-34. The Tenth Circuit found it significant that the clinical psychologist also testified that the defendant "would understand the role of police officers and the concept of a criminal charge," and that the Grisso test was administered years after the interrogation. *Id.* at 933. The court also relied on a videotape showing the defendant's conduct during the interrogation and noted that the defendant had had previous experience with the criminal justice system. *Id.* at 934. In *United States v. Turner*, the Eighth Circuit held that the defendant's *Miranda* waiver was knowing and intelligent even though the defendant's IQ was low-average to borderline, and he was possibly intoxicated by PCP at the time of interrogation and exhibited "bizarre" behavior and possible signs of mental illness after the interrogation. 157 F.3d at 555-56. The court determined that because the defendant was cooperative during the interrogation, gave

accurate information, and, when stopped by police, "acted in a manner more consistent with a person attempting to avoid being caught than a person who did not know what he was doing," the waiver was effective. *Id.* at 555.

In some cases, courts have concluded that a defendant's limited intellectual capacity contributed to the determination that a waiver was not effective. Frequently, however, those cases also feature some observable indication to police that the defendant was incapable of understanding the *Miranda* warnings. For example, in *United States v. Garibay*, 143 F.3d 534, 537-38 (9th Cir. 1998), the defendant suffered from a low IQ, but also primarily spoke Spanish and thus did not possess the English skills to understand the *Miranda* warnings without the assistance of a Spanish-speaking officer. Additionally, an officer that questioned the defendant was forced to rephrase questions when the defendant "did not appear to understand." *Id.* at 539. In *Cooper v. Griffin*, 455 F.2d 1142, 1144-46 (5th Cir. 1972), the Fifth Circuit held that neither defendant knowingly and intelligently waived his *Miranda* rights where both defendants were young boys, aged fifteen and sixteen, who were severely mentally retarded.

In the instant case, Garner's conduct, speech, and appearance at the time of interrogation indicated that his waiver was knowing and intelligent, notwithstanding his diminished mental capacity. Like the defendants in *Mullin* and *Turner*, Garner was carefully read his *Miranda* rights and stated clearly to officers that he understood those rights. Garner agreed to execute a written waiver form, was cooperative during the interrogation, and clearly explained the incident in Mack's apartment. Garner also engaged in conduct prior to being arrested that was "more consistent with a person attempting to avoid being caught than a person who did not know what he was doing." *Turner*, 157 F.3d at 555. Garner invented a story about having a fight with his girlfriend to explain to the taxicab driver why he was removing the items from Mack's apartment, and Garner admitted to police that his purpose in lighting the couch on fire was to ensure that he left no fingerprints behind. Finally, at no time did Garner exhibit any outwardly observable indications that he did not understand the warnings or the circumstances surrounding his interrogation. Garner was not a minor, did not have trouble

understanding English, and, although his IQ level indicates that he was functioning in the borderline range of intelligence, he was not so mentally retarded that officers had reason to believe that he could not understand his rights.

The assessments of Drs. Smalldon, Schmidtgoessling, and Everington, moreover, do not establish that Garner was incapable of effectively waiving his rights notwithstanding this outward evidence. For instance, Dr. Schmidtgoessling stated in her report that, despite Garner's borderline IQ score, Garner was "familiar with the specifics of the allegations against him" and "was able to give a coherent, realistic account of his behavior relevant to the allegations although his account differed in a couple of major respects . . . from the statement made to police." Dr. Schmidtgoessling also noted that Garner was able to understand the roles of the various court personnel, identify his attorneys by name, and define accurately the duties of his attorneys. *Cf. Mullin*, 379 F.3d at 933 (finding it significant that defendant "would understand the role of police officers and the concept of a criminal charge"). Although Garner performed well below average on the complex Trail Making Test, he performed in the superior range on the simple Trail Making Test, received an average score on a memory test, a low average score on a test measuring nonverbal problem solving abilities, and a score within normal limits on a screening test for perceptual motor functions. And while Dr. Smalldon concluded in his affidavit that Garner's borderline intellectual functioning "raise[s] serious doubts" about Garner's ability to understand the *Miranda* warnings, Dr. Smalldon acknowledged that a "[m]ore focused assessment" was necessary. Thus, neither Dr. Smalldon's nor Dr. Schmidtgoessling's assessment provides conclusive evidence that Garner did not understand and appreciate his *Miranda* rights, and Dr. Schmidtgoessling's assessment offers some evidence that suggests that Garner indeed had the capacity to validly waive his rights.

Finally, Dr. Everington's assessment with regard to Garner's understanding during the police interrogation—which relies on her administration of the so-called Grisso test to Garner six years after his confession—adds little to demonstrate that the confession was not knowing and intelligent. The Grisso test purports to "provide an

index of the person's capacity for understanding the *Miranda* warnings at the time of the evaluation." Thomas Grisso, *Instruments for Assessing Understanding & Appreciation of Miranda Rights* 7 (1998). The Grisso test consists of four subtests, styled "instruments," and named as follows: Comprehension of *Miranda* Rights (CMR); Comprehension of *Miranda* Rights-Recognition (CMR-R); Comprehension of *Miranda* Vocabulary (CMV); and Function of Rights in Interrogation (FRI). Dr. Everington administered the Grisso test in 1998, over six years after Garner was interrogated by police.

The results of the first subtest (CMR) provide little support for concluding that Garner could not adequately understand the *Miranda* warnings. The first subtest "assesses the examinee's understanding of the *Miranda* warnings as measured by the examinee's paraphrased description of the warnings." *Id.* at 5. The examinee is presented with each of four sentences of the *Miranda* warning and is invited to tell the examiner "what [the sentence] says in your own words." *Id.* at 17. Responses for each of the four sentences are scored 2, 1, or 0, so that the examinee can get a total of 8 points by optimally paraphrasing the four sentences. The Scoring Criteria portion of the test protocol lists several examples of responses that would receive each of the three possible scores. For instance, the first sentence given to the examinee is "You do not have to make a statement and have the right to remain silent." *Id.* at 19. One example of a 2-point responding paraphrase is "You can tell them everything if you want, or just not say anything." One example of a 1-point response is "I would say it's best to say nothing." One example of a 0-point response is "It means if you don't talk they lock you up." *Id.* at 23-25. On the CMR subtest, Garner received a score of 6 out of the possible 8 points. Dr. Everington noted that Garner had difficulty in providing "a satisfactory definition for two of the four statements of the warning." That is, he got half-credit on two of the four questions. This subtest, at least, does not appear to provide support for a conclusion that Garner could not adequately understand *Miranda* warnings.[3]

---

[3] The Grisso manual provides tables for clinical interpretation of an examinee's scores. Garner's scores would have been roughly in the bottom 30% but not in the bottom 20% of the total adult sample on the CMR subtest. Grisso, *supra*, at 84 tbl.2.

Garner got a perfect score on the second subtest (CMR-R), which "assesses the examinee's understanding of the Miranda warnings as measured by the examinee's ability to identify whether various interpretations provided by the examiner are the same as or different from the warning that was presented." *Id.* at 5. "After each warning statement, the examiner asks the examinee to listen to three other statements, . . . . [and] [t]he examinee simply says 'same' or 'different' after each alternative statement." *Id.* On this subtest, Garner received a score of 12 out of 12 points, placing him higher than 64% of a sample of 260 adults. *Id.* at 85 tbl.3. Dr. Everington noted that Garner's CMR-R score indicated that Garner "did not have difficulty in recognizing the meaning of the warning when presented in a true-false format." This subtest, it should be noted, is the only one of the four that is objectively graded. *Id.* at 11.

While Garner did least well on the third subtest (CMV), much of that subtest evaluated Garner's understanding of words more difficult than those actually used in the warnings given to him. The third subtest "assesses the examinee's ability to define six words that appear in the version of the Miranda warnings on which the [Grisso test is] based." *Id.* at 5. Those words are *consult*, *attorney*, *interrogation*, *appoint*, *entitled*, and *right*. *Id.* at 36-44. The examinee is asked to "tell [the examiner] in your own way what the word means." *Id.* at 35. As in the first subtest, each response gets a score of 2, 1, or 0, so that there is a possible perfect score of 12. For instance, the first word is *consult*. According to the scoring criteria, an example of a full-credit (2-point) response is "To help to decide." An example of a half-credit (1-point) response is "To talk confidentially." An example of a 0-credit response is "To plan something." *Id.* at 39. Dr. Everington reported that Garner had difficulty defining five of the six vocabulary words—*consult*, *attorney*, *appoint*, *entitled*, and *right*—and received a score of 7 out of the possible 12 points. Thus, it appears that Garner received half-credit for each of those five words. Garner's performance was the worst on this part of the test. But three of the five words for which he received half credit (*consult*, *attorney*, and *entitled*) were not present in the version of the *Miranda* rights that police read to Garner. Police used the simpler term "lawyer" in lieu of the term "attorney," the simpler phrase "talk to" in lieu

of the term "consult," and the simpler words "have the right to" in lieu of "entitled."[4]

These differences are significant. Indeed, if Garner had responded "lawyer" (the word actually used in Garner's warning) when asked on the Grisso test to tell what the word "attorney" means, he would have received a full two points for that word. *Id.* at 40. And if he had responded "Has a right to it" (essentially the words used in Garner's warning) when asked on the Grisso test what the word "entitled" means, he would have received a full two points for that word. *Id.* at 43. Even the Grisso manual itself recognizes that

> [w]hen local versions of the warnings are very different from those used in the measures, it is possible that the examinee might receive a score on the instruments that suggests poorer or better understanding than the examinee would have manifested for the version of the warnings that police officers actually provided to the examinee.

*Id.* at 7.[5] Because the language used in the CMV subtest significantly differed from the language used in the warning that police read to Garner, Garner's poor performance on the CMV subtest can hardly be relied upon as evidence that Garner did not understand or appreciate the *Miranda* warnings.[6]

The fourth subtest (FRI) does little more to show that Garner could not understand the *Miranda* warnings. That subtest "assesses the examinee's grasp of the significance of the *Miranda* rights in the context of interrogation" by using "four picture stimuli, which are accompanied by brief vignettes." *Id.* at 6. "Each picture and vignette are [sic] followed by a set of standardized questions (15 in all) that assess the examinee's grasp of the significance of" the rights to counsel and silence, and the nature of

---

[4] As the district court noted, this difference in language also calls into question the validity of Garner's CMR score. For example, Garner's CMR score depended on his ability to phrase the following warning in his own words: "You are entitled to consult with an attorney before interrogation and to have an attorney present at the time of the interrogation." Grisso, *supra*, at 20. The actual warning read to Garner was phrased in simpler terms: "You have the right to talk to a lawyer for advice before we ask you any questions and have him with you during questioning."

[5] Furthermore, the difference between a half-credit and a full-credit response is not always crisp. With respect to *appoint*, "[t]o get a person to do the job" is a 2-point answer, while "[t]o offer them money to do the job" is a 1-point answer. Grisso, *supra*, at 42. In scoring definitions of *right*, "[y]ou are entitled to it" receives 2 points, while "[i]t's your decision" receives 1 point. *Id.* at 44.

[6] Of course, the question of how Garner compares to the rest of the population in understanding a particular set of difficultly-phrased *Miranda* warnings has no bearing on the question of whether he understood the constitutionally adequate warnings actually given to him.

interrogation. *Id.* Five of the questions relate to the nature of police interrogation, five relate to the function and significance of legal counsel, and five relate to the function and significance of the right to silence. Responses again are scored 2, 1, or 0, so that the total possible score is 30. Garner scored 24 points, including a perfect score (10) on the "nature of interrogation" portion and a perfect score (10) on the "right to counsel" portion. He received 4 out of 10 points on the "right to silence" portion.[7] The subjective and legally questionable nature of the grading criteria for this subtest, and particularly for the portion that Garner did poorly on, bring into question its usefulness in determining whether an examinee could understand the *Miranda* warnings. Shown a drawing of a suspect in a room with two police officers, the examinee is asked, "Finish this sentence. If Greg decides to tell the police about what he did, then the things that Greg says _____." *Id.* at 48. One example of a full-credit 2-point answer is "Can turn against him later in court." One example of a half-credit 1-point answer is "Will get him into detention." One example of a 0-credit answer is "He will tell the policemen." *Id.* at 60-61. The minor difference between the 2-point and 1-point answers is notable.[8]

After relating Garner's scores on the Grisso test, Dr. Everington concluded in her report that Garner's Grisso test results "indicate that even six years later, Garner may not have a complete understanding of [the *Miranda*] warning." In her affidavit, prepared two years after the Grisso test and eight years after the interrogation, Dr. Everington used stronger language, concluding that "Mr. Garner's performance on this test indicates that he does not have full comprehension of *Miranda* warnings or his right to remain

---

[7]Garner's total FRI score was below the mean for both adult offenders (26.31) and non-offenders (25.52). Grisso, *supra*, at 94 tbl.12. His scores on the "nature of interrogation" and "right to counsel" portions were above the mean for adult offenders (9.60 and 9.25) and non-offenders (9.61 and 9.07), *id.* at 91-92 tbl.9, 10, while his score on the "right to silence" portion was below the mean for each group (7.48 and 6.84, respectively), *id.* at 93 tbl.11.

[8]Another question involving the right to counsel in this subtest is even more troubling. The examinee is shown a drawing of a courtroom hearing with judge, police officers, parents, the defendant's lawyer, and the defendant. Grisso, *supra*, at 45. The question is: "Greg did not tell the police anything about what he did. Here in court, if he were told to talk about what he did that was wrong, will he have to talk about it?" *Id.* at 49. According to the Scoring Criteria, the 2-point answer is "No," the 1-point answer is "Yes, if his lawyer says it's best to." Three possible 0-point answers are: "Yes," "I don't know," and, remarkably, "Only if the judge tells him to." *Id.* at 66. Given the conceivable situations in which a defendant would be required to talk, such as if he had been granted immunity, and given that in court it is the judge that determines the law, "Only if the judge tells him to" is not a bad answer, yet it would get no points according to the Scoring Criteria.

silent." These conclusions are hardly compelling in light of the apparent problems with drawing this conclusion from Garner's performance on the Grisso test. Other courts have had similar qualms about testimony relying on the test. For instance, the Supreme Court of Connecticut has concluded that a lower court did not abuse its discretion in excluding Grisso test results under its standard for admission of expert scientific evidence. *State v. Griffin*, 869 A.2d 640, 650-52 (Conn. 2005). The court stated "we know of no case in which testimony concerning the Grisso test has been admitted into evidence over objection," and noted cases from Florida and New York in which testimony regarding the Grisso test or similar protocol was excluded following a preliminary hearing on admissibility. *Id.* at 650. The Grisso test itself does not purport to "measure the validity of the waiver of Miranda rights, or 'legal competence' to waive Miranda rights," *see* Grisso, *supra*, at 8, and, consequently, a poor score on one or more parts of the test does not, ipso facto, lead to a conclusion that the examinee lacks the capacity to knowingly and intelligently waive those rights, *see id.* ("[T]here is no particular degree of understanding (or score on these instruments) associated with 'adequate' understanding from a legal perspective."); *see also Mullin*, 379 F.3d at 933 (rejecting claim that *Miranda* waiver of defendant who suffered from borderline mental retardation was unknowing and unintelligent despite low Grisso test scores).

In addition, the Grisso test purports to provide an index for capacity to understand the warnings only "at the time of the evaluation," not at the time that the warnings were given. Grisso, *supra*, at 7; *see also id.* at 71 ("Current comprehension, even if it is valid for the present time, may or may not be representative of the individual's comprehension at some retrospective time."). In this case, Dr. Everington administered the test in 1998, over six years after police read the warnings to Garner. Leaving aside the obvious incentive for a defendant who has already been sentenced to death to feign misunderstanding on such a test, there is simply no way of telling whether Garner's Grisso test scores are an accurate indicator of his ability to understand the warnings when police administered the warnings in 1992. This is so regardless of the fact that studies have indicated that Grisso test scores are generally positively correlated with age. *See id.* at 83 tbl.1. *Cf. Mullin*, 379 F.3d at 933 (noting that "the 'Grisso test'

Dr. Hopewell administered took place years after [defendant's] interrogation and the deterioration of his condition in jail could have affected the results").**9**

It is thus not surprising that Dr. Everington's initial assessment in 1998 concluded only that Garner "*may* not have a complete understanding of [the *Miranda*] warning" and that Garner's deficits in intellectual functioning "*could have* hindered his understanding of [the] process" (emphasis added). Like the conclusions of Drs. Schmidtgoessling and Smalldon, these conclusions do not provide sufficient evidence that Garner's waiver was not knowing and intelligent.

## C.

In sum, Garner's conduct during, and leading up to, the interrogation indicated that he understood and appreciated his *Miranda* rights before executing the waiver. Because nothing in the record demonstrates otherwise, Garner's *Miranda* claim does not require habeas relief. We would reach this conclusion regardless of whether we reviewed the issue de novo, under a deferential AEDPA standard, or under a "modified AEDPA" standard.**10** It is therefore not necessary for us to determine which of these

---

**9**Dr. Everington's administration of the test raises yet another concern with respect to Garner's test scores. While the Grisso test manual "mentions exceptionally high estimates of interrater reliability," that reliability was achieved by requiring raters to participate in "intensive training (16 to 32 hrs.) with additional practice sessions." Richard Rogers, Mandy J. Jordan & Kimberly S. Harrison, *A Critical Review of Published Competency-to-Confess Measures*, 28 Law & Hum. Behav. 707, 712 (2004). A reliability analysis was required for three of the four Grisso subtests (CMR, CMV, FRI) because the scoring of those parts requires the rater to interpret the examinee's response and, based on criteria set out in the scoring manual, to determine whether the response warranted 2, 1, or 0 points. *See* Grisso, *supra*, at 10-12, 17-66. Because of the subjective aspect of these parts of the test, an examinee's score could vary from rater to rater, thus requiring intensive training to establish interrater reliability.

In this case, there is no evidence in the record that Dr. Everington received any training to administer the test, much less the intensive training necessary to ensure the reliability of Garner's scores on the three subjectively-scored parts. And, as Rogers, Jordan, and Harrison have observed, "[t]he likelihood of a forensic practitioner achieving this sophisticated level of training is exceedingly remote." Rogers, Jordan & Harrison, *supra*, at 712. Tellingly, Garner received a perfect score on the CMR-R subtest, the only "totally objective" part of the Grisso test. Because Dr. Everington's administration of the Grisso test brings into question the reliability of Garner's CMR, CMV, and FRI scores, an argument can easily be made that Garner's CMR-R score most accurately represents Garner's ability to comprehend and appreciate the *Miranda* warnings. *See* Grisso, *supra*, at 11 (noting that the CMR-R "requires no judgment on the part of scorers").

**10**Garner did not raise in state court the substantive *Miranda* claim that he now raises in his federal habeas petition, but he did argue in state court on collateral review that his trial counsel were ineffective for failing to inquire into the *Miranda* waiver issue. Apart from the procedural default issue, it could be argued that modified AEDPA review would apply here in light of the fact that the analysis of Garner's substantive *Miranda* claim "bears some similarity" to the analysis of the ineffective-assistance claim adjudicated in state court. *See, e.g.*, *Filiaggi v. Bagley*, 445 F.3d 851, 854 (6th Cir. 2006).

standards applies in this case.  *See* Pierre N. Leval, *Judging Under the Constitution: Dicta About Dicta*, 81 N.Y.U. L. Rev. 1249, 1267 (2006).

### III.

None of Garner's remaining claims warrants habeas relief.  Because Garner's substantive *Miranda* claim lacks merit, the Ohio state courts' determination that Garner's counsel were not ineffective for failing to investigate or raise that claim was not contrary to, or an unreasonable application of, Supreme Court precedent.  *See* Dist. Ct. Op. at 49-50.  Garner's claim that the state trial court erred by not providing him with experts to assist with his *Miranda* claim similarly lacks merit.  Garner was provided with access to mental health experts during trial.  Moreover, the assistance of other experts would not have been sufficient to show that his waiver was unintelligent.  Dist. Ct. Op. at 58-62.  Finally, Garner's claim that the process for selecting the petit jury venire unconstitutionally discriminated against African-Americans was procedurally defaulted and, in any event, is without merit for the reasons stated by the district court.  Dist. Ct. Op. at 27-34.

### IV.

For the foregoing reasons, we affirm the judgment of the district court.

---

**CONCURRING IN RESULT ONLY**

---

MARTHA CRAIG DAUGHTREY, concurring in result only.  What I perceive to be the dispositive issue in this case has somehow disappeared from the discussion at the current stage of the litigation: the procedural default of the *Miranda* issue that resulted from the petitioner's failure to present the issue in state court.  When this case was heard on appeal by the original panel, it resulted in a split decision.  The majority chose to "deem this [procedural default] argument forfeited" based on the state's failure to raise it in the district court.  *Garner v. Mitchell*, 502 F.3d 394, 401 (6th Cir. 2007).  Citing *Trest v. Cain*, 522 U.S. 87, 89 (1997) ("procedural default is normally a defense that the State is obligated to raise and preserv[e] if it is not to lose the right to assert the defense thereafter"), as support for the decision to impose a forfeiture, the majority nevertheless took account of the fact that a procedural default not only  may be recognized for the first time on appeal, *White v. Mitchell*, 431 F.3d 517, 524 (6th Cir. 2005), but also may be raised by the reviewing court *sua sponte*.  *See Elzy v. United States*, 205 F.3d 882, 886 (6th Cir. 2000).  The panel majority decided not to recognize the defense on two grounds: first, because the district court had "expended considerable resources in deciding Garner's *Miranda* claim," *Garner*, 502 F.3d at 401, and, second, because "Garner faces the death penalty."  *Id.*  But, the latter basis could be justified only if the resources expended in the district court had actually produced an adequate record on which to base a reasoned judgment about the alleged *Miranda* violation in this case.  In fact, the record is insufficient to make a reasoned judgment precisely because there was a procedural default of that issue in this case.

Because the *Miranda* issue was not raised and litigated in state court, the only record we have with regard to the petitioner's waiver comes from the suppression hearing in state court.  *See id.* at 410 nn.7-8.  The testimony of the interrogating officers was limited to the question of whether the proper *Miranda* warnings had been given and, to only a superficial extent, whether the petitioner had appeared to understand what was

being communicated by the officers before he was asked to sign a waiver of his rights. We know from the record that Garner appeared "perfectly normal" and "very coherent" to the officers who interrogated him. We do know from the record that prior to trial in state court, Garner underwent assessment by a psychiatrist and a clinical neuropsychologist in order to determine his competency to stand trial. Based on their assessment, a mental-health expert appointed by the state trial court to assist with Garner's defense submitted a report questioning whether he would have been capable of understanding the language used in the waiver or the consequences of signing it. *See id.* at 411. But, because the issue of the petitioner's competency to make a valid *waiver* was never directly or indirectly addressed in the state courts, the prosecution was prevented from countering the implication that the waiver was flawed – for example, by securing additional testimony from the interrogating officers concerning the events preceding the petitioner's confession, or by securing an additional examination that would have addressed his intellectual functioning near the time of his interrogation, rather than many years afterward.

In addition to the insufficiency of the record resulting from the procedural default in the state courts, the decision to ignore that default is unjustified as a matter of law. Indeed, the legal analysis was cogently laid out by Judge Rogers in his dissent from the majority opinion in *Garner*, in which he contended that "even if we have the discretion to disregard the procedural default because of the state's failure to argue procedural default in the district court, it is inconsistent with the principles of AEDPA to exercise that discretion in the context of this case." *Id.* at 423. In support of this contention, he articulated three legally rock-solid reasons. First, he noted, the procedural default was clear. *See id.* at 424. Second, the absence of a state court ruling on the issue was due to "lack of opportunity to pass on the merits, [and] not the result of, for instance, a state court's erroneous application of some procedural hurdle or the ineffective assistance of counsel appointed by the state courts." *Id.* Because there was no state court review of the issue, he argued, the majority's exercise of discretion in the petitioner's favor flew in the face of both "comity and federalism principles." *Id.* (quoting *Perruquet v. Briley*,

390 F.3d 505, 518 (7th Cir. 2004)).  Third, and most significantly, Judge Rogers noted the paradox inherent in the application of a *de novo* standard of review in this case:

> [I]f we were to reach the merits of [petitioner's] constitutional claim, we necessarily would have to do so *de novo*, as there is no state-court decision we can look to for an evaluation of this claim.  This would be inconsistent with the high level of deference to state-court decisions that Congress mandated when it passed the Antiterrorism and Effective Death Penalty Act of 1996.  It would also amount to a windfall for [petitioner], who would win plenary review of a claim that he never presented to the [state] courts, whereas habeas petitioners who properly present their claims to state courts first are entitled only to the extremely narrow review mandated by [28 U.S.C.] section 2254(d).

*Id.* (quoting *Perruquet*, 390 F.3d at 518 (citations omitted)).

For these reasons, I conclude that the petitioner's procedural default of the *Miranda* issue should prevent us from reviewing that question *en banc*, and I would therefore affirm the district court's judgment, but for reasons other than those expressed by the *en banc* majority.

---

**CONCURRING IN PART AND DISSENTING IN PART**

---

COLE, Circuit Judge, concurring in part and dissenting in part.  I concur in the outcome of the majority's opinion but write separately because I disagree with the majority that the "primary focus" in determining whether a waiver was knowing and intelligent is the conduct of the interrogating officers.  As stated in Part I of Judge Moore's dissent, a waiver is not valid if the defendant's lack of maturity, intelligence, or mental capacity prevented him from comprehending the warnings issued to him.  This is the case even if a reasonable officer would have believed the defendant comprehended the warnings.  The majority's reliance on *Rice v. Cooper*, 148 F.3d 747 (7th Cir. 1998) is misplaced.  The requirement that a waiver be knowing and intelligent serves a broader purpose than deterrence of police misconduct.  *See Edwards v. Arizona*, 451 U.S. 477, 482-84 (1981).

Because I believe the district court did not err in finding Garner's waiver knowing and intelligent under the facts of this case, I concur in the judgment only and would **AFFIRM** the decision of the district court.

———————————

**DISSENT**

———————————

KAREN NELSON MOORE, Circuit Judge, dissenting.  The Supreme Court has repeatedly pronounced that a valid waiver of *Miranda* rights must be "a knowing and intelligent relinquishment or abandonment of a known right or privilege." *Edwards v. Arizona*, 451 U.S. 477, 482 (1981).  The en banc majority opinion creates an entirely new rule that allows defendants to establish a lack of a knowing and intelligent waiver only if they do so at the moment they hear their *Miranda* rights.  Under the majority's formulation, the primary focus is on the conduct of police officers and whether the officers had reason to know at the time of the interrogation that the defendant lacked the ability to understand the *Miranda* warning.  While it would be impossible to believe that a deaf defendant could give a knowing and intelligent waiver when he is given only a mumbled *Miranda* warning, the majority's approach would compel such a conclusion.  Demanding more of those whose mental or physical faculties can do only less would surely defeat the purpose of requiring that defendants understand the waiver when they undertake it.  Because I believe the majority's approach is contrary to Supreme Court precedent and that the totality of the circumstances demonstrates that Garner's waiver of his *Miranda* rights was *not* knowing or intelligent, I respectfully dissent.

## I.  LEGAL STANDARDS GOVERNING THE VALIDITY OF WAIVERS

The majority contends that the "primary focus" in determining whether a defendant's waiver was knowing and intelligent is "on what the interrogating officers could have concluded about Garner's ability to understand the warnings."  Maj. Op. at 9.  Applying this approach, the majority concludes that "[b]ecause police had no reason to believe that Garner misunderstood the warnings, and because it is undisputed that the officers were otherwise reasonable and careful in giving the warnings and obtaining the confession, there is no basis for invalidating Garner's *Miranda* waiver."  *Id.*  The majority's focus on the conduct and knowledge of police officers is at odds with the Supreme Court's repeated pronouncements that the proper inquiry is whether the

defendant had the maturity, intelligence, and competency to make a knowing and intelligent waiver.

The Fifth Amendment states that "[n]o person . . . shall be compelled in any criminal case to be a witness against himself." U.S. CONST. amend. V. In *Miranda v. Arizona*, 384 U.S. 436 (1966), the Supreme Court determined that the right against self-incrimination "is fully applicable during a period of custodial interrogation." *Id.* at 461. The *Miranda* Court further determined that "the right to have counsel present at the interrogation is indispensable to the protection of the Fifth Amendment privilege." *Id.* at 469. Moreover, the Court held that, prior to custodial interrogation, a suspect must be informed of these rights, now commonly known as the *Miranda* rights. *Id.* at 444 ("Prior to any questioning, the person must be warned that he has a right to remain silent, that any statement he does make may be used as evidence against him, and that he has a right to the presence of an attorney, either retained or appointed."). Of special import here, the *Miranda* Court noted that "[t]he defendant may waive effectuation of these rights, provided the waiver is made *voluntarily*, *knowingly* and *intelligently*." *Id.* (emphasis added).

Subsequent decisions by the Supreme Court have further clarified that the validity of a waiver depends on it being made not only "voluntarily," but also "knowingly and intelligently." In *Moran v. Burbine*, for example, the Court stated:

> The inquiry has two *distinct* dimensions. First, the relinquishment of the right must have been voluntary in the sense that it was the product of a free and deliberate choice rather than intimidation, coercion, or deception. Second, the waiver must have been made with a full awareness of both the nature of the right being abandoned and the consequences of the decision to abandon it. Only if the "totality of the circumstances surrounding the interrogation" reveal both an uncoerced choice and the requisite level of comprehension may a court properly conclude that the *Miranda* rights have been waived.

*Burbine*, 475 U.S. at 421 (quoting *Fare v. Michael C.*, 442 U.S. 707, 725 (1979)) (emphasis added) (citations omitted); *see also Colorado v. Spring*, 479 U.S. 564, 573-75 (1987) (analyzing separately whether a suspect's waiver of his *Miranda* rights was voluntary and whether it was knowing and intelligent); *Edwards v. Arizona*, 451 U.S.

477, 482 (1981) ("It is reasonably clear under our cases that waivers of counsel must not only be voluntary, but must also constitute a knowing and intelligent relinquishment or abandonment of a known right or privilege . . . ."). Garner does not argue that he waived his *Miranda* rights involuntarily, but he does argue that he waived his rights unknowingly and unintelligently.

Whether a suspect's waiver of *Miranda* rights is "a knowing and intelligent relinquishment or abandonment of a known right or privilege" is "a matter which depends in each case 'upon the particular facts and circumstances surrounding that case, including the background, experience, and conduct of the accused.'" *Edwards*, 451 U.S. at 482 (quoting *Johnson v. Zerbst*, 304 U.S. 458, 464 (1938)). A court must examine the "totality of the circumstances" to determine whether a suspect's waiver was knowing and intelligent, including inquiries into the suspect's "age, experience, education, background, and intelligence, and into whether he has the capacity to understand the warnings given him, the nature of his Fifth Amendment rights, and the consequences of waiving those rights." *Michael C.*, 442 U.S. at 725. "The Constitution does not require that a criminal suspect know and understand every possible consequence of a waiver of the Fifth Amendment privilege," but does require "that a suspect know[] that he may choose not to talk to law enforcement officers, to talk only with counsel present, or to discontinue talking at any time." *Spring*, 479 U.S. at 574; *see also Burbine*, 475 U.S. at 421 ("[T]he waiver must have been made with a full awareness of both the nature of the right being abandoned and the consequences of the decision to abandon it.").

The majority's approach conflicts with the Supreme Court's repeated pronouncements that the proper inquiry is whether the *defendant* actually had the capability to make a knowing and intelligent waiver, *see, e.g.*, *Edwards*, 451 U.S. at 482; *Michael C.*, 442 U.S. at 725; *Zerbst*, 304 U.S. at 464, without any reference to *police* conduct. To suggest, as the majority does, that the validity of a *Miranda* waiver depends only on the conduct of the police—or what the police knew or should have known at the time—is to read the requirement that a valid waiver be "a knowing and intelligent relinquishment or abandonment of a known right or privilege," *Edwards*, 451 U.S. at

482, out of the Supreme Court's *Miranda* jurisprudence. Indeed, under the majority's formulation, even a suspect who did not hear his *Miranda* rights being read somehow could give a knowing and intelligent waiver, so long as the police had no reason to believe that the suspect did not hear.

To support its focus on police conduct, the majority relies heavily upon *Rice v. Cooper*, 148 F.3d 747 (7th Cir. 1998), *cert. denied*, 526 U.S. 1160 (1999). In *Rice*, the Seventh Circuit held that, because there was no police abuse, a sixteen-year-old made a knowing and intelligent waiver of his *Miranda* rights despite the testimony of two psychologists that he had been mentally incompetent to make a valid waiver. *Id.* at 749-51. The Seventh Circuit read the Supreme Court's decision in *Colorado v. Connelly*, 479 U.S. 157 (1986), for the proposition that a defendant's waiver of his *Miranda* rights cannot be unknowing or unintelligent unless there is coercive police activity or the police had some reason to believe that the defendant was incapable of making a rational waiver.

But although the Supreme Court in *Connelly* held "that coercive police activity is a necessary predicate to the finding that a confession is not 'voluntary,'" it did not suggest that coercive police activity is a necessary predicate to a conclusion that a waiver of *Miranda* rights was not knowing or intelligent. *Id.* at 167; *see also United States v. Turner*, 157 F.3d 552, 555 (8th Cir. 1998); *United States v. Bradshaw*, 935 F.2d 295, 299 (D.C. Cir. 1991) ("We read *Connelly* . . . as holding only that police coercion is a necessary prerequisite to a determination that a waiver was *involuntary* and not as bearing on the separate question whether the waiver was knowing and intelligent."); *Miller v. Dugger*, 838 F.2d 1530, 1539 (11th Cir.) ("We do not read the *Connelly* decision as demonstrating an intent to eliminate this distinction between voluntariness and knowing waivers."), *cert. denied*, 486 U.S. 1061 (1988). Indeed, the *Connelly* Court noted that an expert witness "testified that Connelly's illness did not significantly impair his cognitive abilities. Thus, respondent understood the rights he had when [the police] advised him that he need not speak." *Connelly*, 479 U.S. at 161-62. Further, the Seventh Circuit in *Rice* acknowledged that its focus on police conduct diverged from

pre-*Connelly* Supreme Court precedent, or what it called "the conventional approach to waivers of the *Miranda* rights—that of asking simply whether the defendant had the maturity, competence, etc. to make a knowing waiver of his rights, without reference to what the police knew or should have known." *Rice*, 148 F.3d at 751 (citations omitted).

Put simply, the majority completely fails to account for the clear directive of the Supreme Court's *Miranda* jurisprudence that the proper inquiry is whether the defendant had the maturity, intelligence, and mental capacity to make a knowing and intelligent waiver. I recognize that the Supreme Court's requirement that a *Miranda* waiver be made knowingly and intelligently may, on occasion, put the police in the difficult position of having to assess a suspect's understanding and intellectual capacities at the time of interrogation. This difficulty is not wholly unique, however, as courts face similar difficulties, for example, when assessing a defendant's competency and understanding during a plea colloquy or when a defendant waives the right to counsel. Suspicions that a suspect's initial *Miranda* waiver was not made knowingly and intelligently also do not preclude the police from interrogating the suspect later under different circumstances—for example, following evaluation by a mental-health professional, following treatment, or in the presence of a lawyer, *see, e.g.*, *In re B.M.B.*, 955 P.2d 1302, 1309-13 (Kan. 1998)—if the police desire greater assurances that the suspect's statement will be deemed admissible at trial.

## II.  RELEVANT FACTS

Having determined that the proper focus should be on Garner's "age, experience, education, background, and intelligence," *Michael C.*, 442 U.S. at 725, rather than on the conduct of the police, I now turn to analyzing these factors. Because I believe the majority fails to give adequate consideration to the factual record bearing on these factors, I briefly consider the relevant facts. Garner was nineteen years old at the time of the offense. He was "the product of a very abusive and disorganized family of origin." 2 Joint Appendix ("J.A.") at 513 (Schmidtgoessling Report at 3). Garner endured physical abuse at the hands of his mother and more than one of her boyfriends, suffered sexual abuse at the hands of an older brother, was left with his siblings to

provide food and clothing for himself, and was repeatedly kicked out of his home. Garner's mother testified that Garner and his twin brother attended the first few years of school together in the same class, but that they were thereafter separated because Garner's brother had been doing Garner's work for him. Thereafter, Garner "didn't do very well" in school. 3 J.A. at 1028 (Mitigation Hr'g 10/13/92 at 52 (Patricia Garner Test.)). Garner told the police that he could read and had completed the twelfth grade, but his mother testified that the last grade that he completed was the seventh grade, and both his mother and school records indicated that Garner's grades were always poor, that he was held back at least once, that he was frequently absent from school, and that he was placed in a variety of correctional or treatment-focused schools. According to his mother, Garner had at least one encounter with the juvenile court system. In 1992, the year of the offense, Garner had a full-scale Wechsler Adult Intelligence Scales-Revised IQ score of 76, placing him in the borderline range of intellectual functioning, as well as signs of a learning disability, attention deficit disorder, and organic brain impairment.[1]

The circumstances of Garner's interrogation are also relevant. On January 26, 1992, police executed a search warrant at 3250 Burnet Avenue and arrested Garner. Officer Harry C. Frisby, Jr. ("Frisby"), of the Cincinnati Police Department advised Garner of his *Miranda* rights, and Garner said that he understood his rights.[2] Officer Frisby asked Garner about several items that Officer Frisby believed had been stolen, but Garner said that the items were his. Garner was then taken to the police station.

---

[1]Dr. Everington's report, though not admitted by the district court for this purpose, confirmed that Garner had relatively consistent IQ scores between 76 and 81 as well as significant deficits in language abilities. 1 J.A. at 376-77 (Everington Report at 2-3).

[2]Officer Frisby testified as follows:
A:    Before I said, Mr. Garner, let me advise you of your rights and I had a booklet that had his rights in it - - on the front of it. You have the right to remain silent, that anything you say can be used against you in court. You have the right to talk to a lawyer for advice before we ask you any questions and have him with you during questioning. If you decide to answer questions now without a lawyer present, you still have the right to stop answering at any time. You also have the right to talk to a lawyer before any questioning if you wish. And I asked him if he understood those rights and he said yes.
Suppression Hr'g at 68 (Frisby Test.).

At the police station, Officer Frisby and Officer David Feldhaus ("Feldhaus") interrogated Garner. Officer Feldhaus advised Garner of his *Miranda* rights again, read a waiver-of-rights form to Garner, and Garner, Officer Frisby, and Officer Feldhaus signed the form.[3] The two officers proceeded to interrogate Garner. Officer Feldhaus testified that Garner appeared "perfectly normal" and "very coherent" and that Garner answered when questioned that he was not under the influence of drugs or alcohol. 3 J.A. at 944 (Suppression Hr'g at 204 (Feldhaus Test.)). Officer Frisby testified that Garner initially denied any involvement with the crimes and that he, Officer Frisby, repeatedly told Garner that he thought Garner was lying. After approximately forty minutes, the two officer began tape recording the interrogation, and Garner confessed to stealing items from 3250 Burnet Avenue and setting a fire.

I now turn to considering "whether [Garner] ha[d] the capacity to understand the warnings given him, the nature of his Fifth Amendment rights, and the consequences of waiving those rights." *Michael C.*, 442 U.S. at 725. On collateral review in state court, Dr. Jeffrey Smalldon ("Smalldon"), a mental-health expert appointed by the state trial

---

[3]Officer Feldhaus testified as follows:

Q: Carry us through and see, you know, exactly what was said as best you can remember.
A: Each line?
Q: Yeah.
A: You have a right to remain silent. He said he understood that. Anything you say can be used against you in court.
Q: Did he reply to that?
A: Yes. Do you understand that? Yes. You have the right to talk to a lawyer for advice before we ask you any questions and have him with you during questioning. You understand that? Yes. If you cannot afford a lawyer one will be appointed for you before any questioning if you wish. Understand that? Yes. If you decide to answer questions now without a lawyer present you will still have the right to stop answering at any time. You also have the right to stop answering at any time until you talk to a lawyer. You understand that? The reply was yes.
    I then said below that we have a waiver of rights. And I told him, I'll read this for you.
Q: Pardon me. Did you read the whole paragraph?
A: I said, I have read this statement on rights. I understand what my rights are. I am going to make a statement and answer questions. I do not want a lawyer at this time. I understand and know what I am doing. No promises or threats have been made to me and no pressure or coercion of any kind have been used again [sic] me. I asked him if he understood that. He said he did. I said, you have any questions about your rights? He replied, no. I said, well, if there's no questions and you understand it, I need you to sign your name and the time it is. At that time he signed his name. He said, what time is it? I held my wrist watch out and he looked at it, signed the time.

3 J.A. at 955-57 (Suppression Hr'g at 215-17 (Feldhaus Test.)).

court to assist with the defense, submitted an affidavit regarding a number of issues. Dr. Smalldon stated that he had personally interviewed, tested, and assessed Garner in addition to reviewing reports from Dr. Nancy Schmidtgoessling ("Schmidtgoessling"), who was appointed by the state trial court to assess Garner's competency to stand trial, and Dr. Joseph D. Schroeder ("Schroeder"), a clinical neuropsychologist who further assessed Garner because of concerns raised by Dr. Schmidtgoessling. Regarding the issue at hand, Dr. Smalldon concluded that "Mr. Garner's borderline intelligence, functional (i.e., organic) brain impairment, abusive and socially deprived background, and long history of impulsivity raise serious questions as to whether he could or did understand the consequences of signing the 'Waiver of Rights.'" 3 J.A. at 921 (Smalldon Aff. at ¶ 10). Dr. Smalldon further concluded that "[t]he same assessment findings alluded to above, as well as my own clinical impressions, also raise serious questions about whether he had the ability to understand and appreciate the implications of the language used in the 'Waiver of Rights' form that he signed." 3 J.A. at 921 (Smalldon Aff. at ¶ 11). Dr. Smalldon opined that "[m]ore focused assessment would provide better, and perhaps even conclusive, information on this issue." 3 J.A. at 922 (Smalldon Aff. at ¶ 13).[4]

Dr. Everington provided this more focused assessment regarding Garner's understanding of his waiver of *Miranda* rights. Dr. Everington administered the Grisso test, specifically designed to "assess[] a defendant's comprehension of the Miranda warnings themselves" and "provid[e] a comparison of the defendant's performance to that of other defendants of various ages and levels of intelligence." THOMAS GRISSO, INSTRUMENTS FOR ASSESSING UNDERSTANDING & APPRECIATION OF MIRANDA RIGHTS 4 (1998). The Grisso test includes four separate testing instruments. The first instrument, Comprehension of *Miranda* Rights ("CMR"),

> assesses the examinee's understanding of the Miranda warnings as measured by the examinee's paraphrased description of the warnings.

---

[4]The majority discounts the value of Dr. Smalldon's statements based on this qualifying language. *See* Maj. Op. at 10, 14. But, as I explain, Dr. Everington answered this call for a more focused assessment by using the Grisso test to evaluate Garner's understanding of his *Miranda* rights.

> The procedure involves presentation of each of the four Miranda warnings, one by one, to the examinee. After each warning is presented, the examinee is invited to tell the examiner "what that means in your own words."

*Id.* at 5. Answers are scored two points for "adequate" responses, one point for "questionable" responses, and zero points for "inadequate" responses, producing a total CMR score between zero and eight. *Id.*

The second instrument, Comprehension of Miranda Rights—Recognition ("CMR-R"),

> assesses the examinee's understanding of the Miranda warnings as measured by the examinee's ability to identify whether various interpretations provided by the examiner are the same as or different from the warning that was presented.
> . . .
> As with the CMR, the CMR-R requires that each warning be presented to the examinee. After each warning statement, the examiner asks the examinee to listen to three other statements, some of which are the same as the warning and some of which are not the same. The examinee simply says "same" or "different" after each alternative statement.

*Id.* Answers are scored one point for each correct response, producing a total CMR-R score between zero and twelve. *Id.*

The third instrument, Comprehension of Miranda Vocabulary (CMV), "assesses the examinee's ability to define six words that appear in the version of the Miranda warnings on which the Miranda instruments are based. The examiner reads each word, uses it in a sentence, and then asks the examinee to define the word." *Id.* Answers are scored two points for "adequate" responses, one point for "questionable" responses, and zero points for "inadequate" responses, producing a total CMV score between zero and twelve. *Id.* at 5-6.

The fourth instrument, Function of Rights in Interrogation ("FRI"),

> assesses the examinee's grasp of the significance of the Miranda rights in the context of interrogation. For example, some defendants may understand the warning that they have the "right to an attorney," yet they

may fail to appreciate its significance because they do not understand what an attorney does. The FRI, therefore, goes beyond understanding of the Miranda warning themselves to explore examinees' grasp of the significance of the warnings in three areas:

- *Nature of Interrogation:* jeopardy associated with interrogation
- *Right to Counsel:* the function of legal counsel
- *Right to Silence:* protections related to the right to silence, and the role of confessions

The FRI uses four picture stimuli, which are accompanied by brief vignettes (e.g., a story about a suspect who has been arrested, accompanied by a picture of a young man sitting at a table with two police officers). Each picture and vignette are followed by a set of standardized questions (15 in all) that assess the examinee's grasp of the significance of the three matters noted previously.

*Id.* at 6. Answers are scored two points for "adequate" responses, one point for "questionable" responses, and zero points for "inadequate" responses, producing a total FRI score between zero and thirty as well as subscale scores between zero and ten regarding recognition of the nature of interrogation, the significance of the right to counsel, and the significance of the right to silence. *Id.*

Dr. Everington administered the Grisso test in 1998 when Garner was 26 years old, approximately six years after Garner's interrogation. Garner received a CMR score of six, which "was below that of mentally typical adult subjects as well as below persons in his IQ range." 1 J.A. at 378 (Everington Report at 9). Garner's score was slightly below the mean score of thirteen-year-old juvenile delinquents of average intelligence but slightly above the mean score of twelve-year-old juvenile delinquents of average intelligence.[5] *See* Grisso, *supra*, at 87 tbl.5. On the CMR-R, Garner received a perfect score of twelve, "indicating that he did not have difficulty in recognizing the meaning of the warning when presented in a true-false format." 1 J.A. at 378 (Everington Report at 9). On the CMV, Garner had difficulty defining five of the six vocabulary words:

---

[5]Grisso notes that CMR, CMR-R, and CMV scores "may be compared to norms for delinquent youths and adult offenders of various ages and levels of intelligence," as provided in a series of tables reporting results from earlier studies. Grisso, *supra*, at 5-6; *see also id.* at 68. FRI and FRI subscale results form earlier studies are not delineated by age and IQ score, but still provide "norms for delinquent youths and adult offenders of various ages." *Id.* at 6.

consult, attorney, appoint, entitled, and right. Garner received a score of seven, which was "below mentally typical peers and persons in his IQ range," *id.*, and below the mean score of twelve-year-old juvenile delinquents of average intelligence, *see* GRISSO, *supra*, at 88 tbl.6. Finally, Garner received a FRI score of twenty-four, "below that of adult offenders and non offenders." 1 J.A. at 378 (Everington Report at 9). Dr. Everington further noted that "all the items that [Garner] missed [on the FRI] were in one are[a]—the function of the right to silence—indicating that he still does [not] have a full understanding of this right, even after six years." *Id.* Garner's right-to-silence FRI subscale score of four was below the mean scores of adult offenders (7.48), adult nonoffenders (6.84), and juvenile delinquents (5.52). *See* GRISSO, *supra*, at 93 tbl.11. Dr. Everington concluded that the test results "indicate[d] that [Garner] does not have full comprehension of *Miranda* warnings or his right to remain silent." 1 J.A. at 373 (Everington Aff. at ¶ 17).

### III. ANALYSIS

Given Garner's low IQ scores and other mental disabilities, I now turn to considering carefully whether Garner knowingly and intelligently waived his *Miranda* rights. As the majority notes, along with other courts, we have rejected calls to establish a categorical rule that a low IQ or other significant limitations in intellectual functioning are dispositive and make a suspect with such characteristics categorically unable to give a valid waiver of *Miranda* rights. Maj. Op. at 12. However, we also have not established a categorical rule that an express waiver from a person with a low IQ or other significant limitations similar to Garner's is always knowing and intelligent. Moreover, other courts have concluded that suspects with similar limitations in intellectual functioning did not knowingly and intelligently waive their *Miranda* rights in particular circumstances. *See, e.g.*, *United States v. Garibay*, 143 F.3d 534, 538-39 (9th Cir. 1998) (concluding that a suspect with an IQ score that placed him in the borderline range of intellectual functioning did not knowingly and intelligently waive his *Miranda* rights); *Cooper v. Griffin*, 455 F.2d 1142, 1144-46 (5th Cir. 1972) (concluding that two teenage suspects with IQs between 61 and 67 did not knowingly and intelligently waive their

*Miranda* rights); *United States v. Aikens*, 13 F. Supp. 2d 28, 34 (D.D.C. 1998) (concluding that a suspect with an IQ of 71 did not knowingly and intelligently waive his *Miranda* rights); *State v. Caldwell*, 611 So. 2d 1149, 1152 (Ala. Crim. App. 1992) (affirming the trial court's ruling that a suspect with an IQ of 71 did not knowingly and intelligently waive her *Miranda* rights), *cert. denied*, 510 U.S. 904 (1993); *People v. Bernasco*, 562 N.E.2d 958, 963-66 (Ill. 1990) (affirming the trial court's ruling that a 17-year-old suspect with an IQ of 80 did not knowingly and intelligently waive his *Miranda* rights), *cert. denied*, 500 U.S. 932 (1991), *abrogated on other grounds by People v. G.O. (In re G.O.)*, 727 N.E.2d 1003, 1010 (Ill. 2000).

Precedent also provides more specific guidance for our inquiry in this case. Those cases in which a court decided that a suspect with mental disabilities knowingly and intelligently waived his or her *Miranda* rights generally exhibit one or both of two important characteristics not found in this case. In a number of cases, the suspect produced expert evidence of mental disabilities, but did not produce any expert evidence that those disabilities made him or her incapable of knowingly and intelligently waiving *Miranda* rights or that he or she did not give a valid waiver in that particular instance. *See, e.g.*, *Finley v. Rogers*, 116 F. App'x 630, 636-38 (6th Cir. 2004) (unpublished opinion); *United States v. Turner*, 157 F.3d 552, 555 (8th Cir. 1998); *United States v. Male Juvenile*, 121 F.3d 34, 40 (2d Cir. 1997); *Correll v. Thompson*, 63 F.3d 1279, 1288 (4th Cir. 1995), *cert. denied*, 516 U.S. 1035 (1996); *Dunkins v. Thigpen*, 854 F.2d 394, 398-400 (11th Cir. 1988), *cert. denied*, 489 U.S. 1059 (1989).[6] In those cases in which the suspect did produce specific expert evidence, typically at least one expert, usually the state's but sometimes even the suspect's, countered the assertion that the suspect did not knowingly and intelligently waive his or her *Miranda* rights. *See, e.g.*, *Clark v. Mitchell*, 425 F.3d 270, 275 (6th Cir. 2005); *Taylor v. Rogers*, No. 95-3904, 1996 WL 515349, at *3 (6th Cir. Sept. 10, 1996) (unpublished opinion); *Young v. Walls*, 311 F.3d

---

[6]For instance, in *Turner*, which the majority cites, Maj. Op. at 7, 12-13, the Eighth Circuit held that the defendant gave a valid waiver despite evidence of the defendant's low IQ and mental illness. 157 F.3d at 555. But the defendant in *Turner* did not produce expert evidence that these disabilities made him incapable of knowingly and intelligently making a waiver of *Miranda* rights.

846, 849 (7th Cir. 2002); *People v. Jenkins*, 19 Cal. Rptr. 3d 386, 395 (Cal. Ct. App. 2004). *But see Smith v. Mullin*, 379 F.3d 919, 932-34 (10th Cir. 2004).

In the case at hand, in contrast, Dr. Everington offered her unrebutted expert opinion that Garner "does not have full comprehension of *Miranda* warnings or his right to remain silent." 1 J.A. at 373 (Everington Aff. at ¶ 17). Although the state did not counter that evidence with expert evidence to the contrary, the majority concludes that because of the limitations of the Grisso test, Dr. Everington's affidavit and report "do not provide sufficient evidence that Garner's waiver was not knowing and intelligent." Maj. Op. at 20. First, the majority notes that the Grisso test measured Garner's understanding of the *Miranda* warnings at the time of the test, in 1998, and not at the time of his interrogation, in 1992. Maj. Op. at 19-20. However, the Grisso test manual does not indicate that it is reasonable to assume that Garner understood the *Miranda* warnings *better* at the time of his interrogation than he did at the time of the test. The manual lists a number of factors that Dr. Everington was to take into account in making a retrospective determination, *see* GRISSO, *supra*, at 71-72, and Dr. Everington concluded that "[i]n [her] professional opinion, it is reasonable to assume that he would not have comprehended the warnings any better under the highly stressful conditions present during the interrogation prior to trial." 1 J.A. at 373 (Everington Aff. at ¶ 17). Moreover, study results indicate that scores on the Grisso test are positively correlated with age—that is, one would generally expect Garner's Grisso test scores to be *higher* in 1998 than in 1992. *See* GRISSO, *supra*, at 83 tbl. 1, 87 tbl. 5, 88 tbl. 6.

Second, the majority makes much of the fact that the CMV subtest of the Grisso test administered to Garner contained different language than the *Miranda* warnings given to Garner. Maj. Op. at 17. Specifically, in addition to a number of slight differences in language, the Grisso test warnings used, for example, the word "attorney" instead of "lawyer" and "interrogation" instead of "questioning." GRISSO, *supra*, at 20. However, many of Dr. Everington's conclusions are unaffected by these differences. First, despite differences in language, "[n]evertheless, the comparison of the examinee's performance to the norms offered in the manual will provide an indication of the

examinee's capacities for understanding relative to other examinees in the research study for which the instruments were developed. Thus comparative interpretations regarding the examinee's performance relative to people of various ages and levels of intelligence can still be made." GRISSO, *supra*, at 7. Garner consistently scored below persons in his age and IQ ranges, indicating that his competence for waiving his *Miranda* rights as suggested by his general cognitive abilities did not accurately reflect whether he actually knowingly and intelligently did so. Second, although three of the words that Garner could not define as part of the CMV—consult, attorney, and entitled—were not used in the warnings actually given him, Garner could not give a satisfactory definition of two key words common to both the test and the warnings: appoint and right. Third, the Grisso test warnings regarding the right to remain silent were identical in all relevant respects to those given by Officers Frisby and Feldhaus, and Garner's Grisso test results indicated that Garner had significant difficulties understanding the right to remain silent.[7]

The majority also contends that Garner's results on the CMR and FRI subtests provide little support for Dr. Everington's conclusion that Garner did not adequately comprehend the *Miranda* warnings. Maj. Op. at 15-16, 18. First, the majority dismisses the results of the CMR subtest because Garner gave unsatisfactory responses to only two of the four questions. Dr. Everington, by contrast, credited the CMR results, noting that Garner's score put him "below that of mentally typical adult subjects as well as below persons in his IQ range." 1 J.A. at 378 (Everington Report at 9). The majority's rejection of Dr. Everington's reliance on the CMR results amounts to second-guessing the opinion of an expert in forensic psychology who personally administered the tests to Garner. With respect to the FRI subtest, the majority takes issue with the subtest's methodology, calling it "subjective and legally questionable." Maj. Op. at 18. Citing

---

[7]The majority also notes two other limitations of Grisso test, although these limitations need not concern us long. First, an individual may feign misunderstanding or otherwise attempt to give inaccurate responses. Maj. Op. at 20. However, the Grisso test includes internal mechanisms by which to determine whether a subject is feigning misunderstanding, *see* GRISSO, *supra*, at 70-71, and, as the district court determined, there is no indication that Garner's Grisso test results are in any way inauthentic. Second, the Grisso test does not measure the ultimate validity of a *Miranda* waiver. Maj. Op. at 19. That, of course, is a question for the court.

no authority for this critique, the majority substitutes its own cursory analysis for expert opinion holding that the FRI subtest can be probative of a defendant's comprehension of the *Miranda* warnings. As the creator of the Grisso test has explained, the FRI subtest was developed in consultation with a panel of attorneys and psychologists. *See* GRISSO, *supra*, at 12, 45. Moreover, the Grisso test as a whole was subjected to extensive peer review during its development and has been widely accepted in the field of forensic psychology. *See id.* at 74-76.[8]

Additionally, the majority gives great weight to evidence tending to show that Garner did knowingly and intelligently waive his *Miranda* rights. However, this evidence is subject to significant limitations not recognized by the majority. First, the majority credits statements from Dr. Schmidtgoessling that Garner "appeared to be of near average intelligence" and "appeared to be able to understand all questions and material presented to him suggesting that his receptive language is intact." Maj. Op. at 10 (quoting Schmidtgoessling Report at 2). However, Dr. Schmidtgoessling's report must be read in context. The relevant portion of the report states: "[Garner] appeared to be of near average intelligence *by observation*. His memory appeared to be intact. He appeared to be able to understand all questions and material presented to him suggesting that his receptive language is intact." Schmidtgoessling Report at 2 (emphasis added). In this portion of her report, Dr. Schmidtgoessling was describing only her initial observations, observations later determined to be inaccurate by results from her own tests as well as by tests administered by Dr. Smalldon, Dr. Schroeder, and Dr. Everington, and the majority errs in relying on Dr. Schmidtgoessling's observations as substantive conclusions. The expert evidence that Garner's appearance did not accurately reflect his level of intelligence and understanding also undermines any substantial reliance on the police officers' testimony that Garner appeared to understand

---

[8]The majority also argues that Dr. Everington may have lacked the experience necessary to reliably administer the Grisso test to Garner in 1998. Maj. Op. at 20 n.9. In fact, Dr. Everington has co-authored two scholarly articles—one of which was published in 1995—that involved administering the Grisso test to dozens of criminal defendants. *See* Caroline Everington & Solomon M. Fulero, *Competence to Confess: Measuring Understanding and Suggestibility of Defendants with Mental Retardation*, 37 MENTAL RETARDATION 212 (1999); Solomon M. Fulero & Caroline Everington, *Assessing Competency to Waive* Miranda *Rights in Defendants with Mental Retardation*, 19 LAW & HUM. BEHAV. 533 (1995).

the warnings. *Cf.* Morgan Cloud et al., *Words Without Meaning: The Constitution, Confessions, and Mentally Retarded Suspects*, 69 U. CHI. L. REV. 495, 511-14 (2002) (discussing the difficulty in estimating the level of understanding of those with mental disabilities).

Similarly, the majority gives great weight to the fact that the police had no reason to believe that Garner could not understand his *Miranda* rights and that Garner told the police officers that he understood his *Miranda* rights. Maj. Op. at 13-14. As I have explained, the majority's focus on whether the police had reason to believe Garner could not make a knowing and intelligent waiver is at odds with Supreme Court precedent. By focusing on whether Garner exhibited "any outwardly observable indications that he did not understand the warnings," Maj. Op. at 13, the majority's misguided analysis sidesteps the essential question of whether Garner actually had the intelligence, maturity, etc. to make an intelligent and knowing waiver. With respect to Garner's statements that he understood his rights and the waiver, Dr. Everington concluded in her report that Garner's "cognitive and linguistic limitations make the likelihood of misunderstanding and suggestibility to input from others greater than with mentally typical individuals." 1 J.A. at 379 (Everington Report at 10); *see also* Cloud et al., 69 U. CHI. L. REV. at 511-12 & n.76 (describing how people with mental disabilities are "unusually susceptible to the perceived wishes of authority figures"). Thus, although Garner's statements of understanding are evidence that he knowingly and intelligently waived his *Miranda* rights, *see, e.g.*, *Turner*, 157 F.3d at 555, the probative value of this evidence is limited by Dr. Everington's expert evidence. Furthermore, although Garner was advised of his *Miranda* rights twice, repetition of the warnings was unlikely to be of any value if he did not understand them the first time, and warnings given after a suspect has already spoken once with police are often ineffective regardless of the suspect's cognitive abilities. *See Missouri v. Seibert*, 542 U.S. 600, 611-14 (2004) (plurality opinion).

In sum, the evidence shows that Garner was nineteen years old at the time of his interrogation and had a very poor education, an IQ of 76, and other significant limitations in intellectual functioning, including limitations directly related to the

understanding and comprehension of his *Miranda* rights. Specifically, Dr. Everington's unrebutted expert evidence indicated that Garner could not satisfactorily define the word "right" and did not understand the right to remain silent. Similar evidence has led other courts to conclude that suspects did not knowingly and intelligently waive their *Miranda* rights. *See Aikens*, 13 F. Supp. 2d at 32, 34 (suppressing a statement from a suspect with an IQ of 71 because he did not understand the right to remain silent or that he was entitled to have a lawyer present during questioning, despite the fact that police officers went over each warning with him one by one); *Bernasco*, 562 N.E.2d at 362-63 (affirming a trial court's ruling suppressing a statement from a suspect with an IQ of 80 because he did not understand the word "right" and other words contained in the *Miranda* warnings, although he did understand the right to remain silent). *But see Mullin*, 379 F.3d at 932-34 (concluding on habeas review under AEDPA that a suspect with "mild to borderline mental retardation" gave a knowing and intelligent waiver despite contrary results from a Grisso test administered years after the interrogation). Similarly here, Garner's young age, indeterminate prior experience with the legal system, poor education, significant limitations in intellectual functioning, and the unrebutted expert evidence all tend to show that Garner's *Miranda* waiver was not made knowingly and intelligently. *Cf. Michael C.*, 442 U.S. at 725 (listing factors to be considered). The only significant evidence to the contrary is the fact that Garner told police at the time of his interrogation that he understood his rights and the waiver, but he has introduced unrebutted expert evidence indicating that this evidence should not be given great weight. Accordingly, I believe that the preponderance of the evidence shows

that Garner did not knowingly and intelligently waive his *Miranda* rights.**9** Thus, admission of his statement at trial was unconstitutional.

## IV. CONCLUSION

For the reasons described above, I believe that the proper inquiry in determining whether a defendant made a knowing and intelligent waiver of his *Miranda* rights is the defendant's actual maturity, education, intelligence, and mental competency. I believe the majority's focus on police conduct, and whether the police had reason to know that a defendant lacked the capacity to make a knowing and intelligent waiver, departs from well-established Supreme Court precedent. Furthermore, I believe that Garner did not knowingly and intelligently waive his *Miranda* rights before his interrogation. Accordingly, I would reverse the judgment of the district court and remand the case with instructions that the district court issue the writ of habeas corpus. I respectfully dissent.

---

**9**To be clear, I do not argue that a person with Garner's mental disabilities is categorically *unable* to knowingly and intelligently waive his *Miranda* rights, only that the preponderance of the evidence shows that Garner did not do so in this case. *Cf. United States v. Macklin*, 900 F.2d 948, 952 (6th Cir.) (describing the potential disempowering effect of ruling that people with mental disabilities do not have the capacity to waive legal rights), *cert. denied*, 498 U.S. 840 (1990). Garner may very well have been able to do so under different circumstances—for example, if his rights had been explained to him in very simple terms, *see Young*, 311 F.3d at 849, or if he had the assistance of a lawyer, social worker, or family member, *cf. G.O.*, 727 N.E.2d at 72-74 & n.11 (McMorrow, J., dissenting) (stating that no confession given by a suspect under the age of 15 should be admitted into evidence unless the suspect is permitted to consult with a lawyer, family member, or other adult personally interested in the child's well-being and listing states that have adopted such a rule); *B.M.B.*, 955 P.2d at 1309-13 (adopting a similar rule and discussing decisions from other states that have also done so).