*390 CLAY, Circuit Judge,
dissenting.
I write separately because Shannon Shields, a mentally retarded defendant, suffered a serious injustice when the district court largely disregarded and minimized his mental status during the trial proceedings. As a result, Shields’ right to a fair and constitutionally adequate trial was seriously compromised. I therefore respectfully dissent.
The kidnapping and murder of Jerrell Lott was a senseless and shocking crime. Soon after apprehending Shannon Shields and his cousin, Sonny Shields, the government announced its intention to seek the death penalty against the two accused men. Shannon Shields then requested a pretrial hearing to determine whether he was mentally retarded and thus ineligible to face the death penalty under Atkins v. Virginia, 536 U.S. 304, 321, 122 S.Ct. 2242, 153 L.Ed.2d 335 (2002).
The district court held an extensive eight-day evidentiary hearing on the matter. In the course of the hearing, the defense presented the expert testimony of two psychologists, as well as the lay testimony of Shields’ parents, his sister, his longtime girlfriend, several of his former educators, and a prison counselor. The government presented the competing expert testimony of two additional psychologists. After considering the evidence and post-hearing memoranda, the district court issued a lengthy order finding Shields mentally retarded and thus ineligible to face the death penalty. (See RE 557, Order on Mental Retardation.)
The hearing produced ample evidence to conclude that Shields is mentally retarded. In five IQ tests administered over Shields’ lifetime, his scores ranged from 69 at the lowest to 73 at the highest.[1] Shields cannot live independently, and he does not work. He relies extensively on the assistance of his parents and his girlfriend to complete common, everyday tasks. Shields cannot prepare his own food, follow a recipe, or shop for groceries. He cannot budget his own money, pay his monthly bills, or master a checkbook. Concepts that are, to the normal-functioning person, simple matters of common sense, are beyond Shields’ grasp. To cite but a few salient examples, Shields does not understand the obligation to repay purchases made with a credit card. He does not see the need for and lacks the follow-through to obtain an identification card. He does not grasp the dangers of leaving a hot iron unattended.
Shields is completely unable to set his own priorities, to self-direct, or to complete even the most rudimentary tasks without the continual supervision and frequent reminders of a parent or other responsible adult. Although Shields has worked for brief periods in several unskilled positions, such as a dishwasher and a furniture mover, he has never been able to maintain steady employment due to his innate mental limitations. His inability to follow directions or to work productively without continual direction has also hindered his job prospects. As a result of these limitations, Shields has received some form of social security disability assistance since his teenage years.
Shields’ mental limitations became manifest early in his childhood education. Without parental assistance, he struggled with grooming and personal hygiene, and he did not relate to his classmates in “age-appropriate” ways. After a year in kindergarten, Shields was unable to even rec *391 ognize his own name in writing, let alone read or write it himself, despite his teacher’s personal efforts to help him master this simple goal. In later years, Shields was disallowed from riding the school bus because of his lack of independence and his frequent outbursts. In the classroom, Shields required constant individualized attention and instruction because he was unable to work independently or to stay on task without a teacher’s direct supervision. Although Shields initially started on a mixed track of special education and regular classes, he struggled with the regular curricula and fell appreciably behind his peer group. By the ninth grade, school administrators completely removed Shields from the regular classroom and placed him on track to receive a “certificate of attendance” rather than a high school diploma. Shields’ special education programming did not teach mainstream educational curricula, but instead focused on functional skills, such as learning how to count money and how to write basic information, like his address and his parents’ names. Ultimately, Shields dropped out of school entirely by the tenth grade.
Despite the extent of Shields’ mental deficiencies, his hindrances are not of the type that would be readily apparent to the average observer. As an adult, Shields is now “careful about his appearance” and “tries to keep himself well-groomed.” He can speak well, and he possesses some limited reading skills, although his comprehension is sub-average, and he “lack[s] the ability to engage in deep and meaningful conversation.” He is skilled at convincing others around him to accomplish tasks on his behalf, he ignores social strictures (for example, he drives although he has no license to do so), and he deceives others to achieve his personal objectives. Shields is often deceptive and manipulative; however, his stratagems are “transparent” and “not well thought out.” Shields is gullible, susceptible to the influence of his peers, and he seemingly lacks ambition or long-term goals of his own. To quote the district court, Shields is an individual whose mental limitations render him “largely disconnected from the types of social responsibilities and tasks expected of regularly functioning adults in society.”
The district court deserves commendation for the attention it devoted to Shields’ mental retardation hearing and its evaluations of Shields’ eligibility for the death penalty. However, a defendant is not mentally retarded for purposes of the death penalty alone. As with any factual finding in a criminal proceeding, the district court’s rulings on mental retardation should have proven salient throughout the remainder of Shields’ trial proceedings. Unfortunately, after making detailed factual assessments about Shields’ mental limitations, the district court then inexplicably shelved those facts and proceeded as though Shields’ innate limitations did not exist for the remainder of his trial.
While defense counsel’s willingness to also ignore Shields’ mental retardation is incomprehensible, it is equally inexcusable for the district court to have set aside its own factual findings for the remainder of the trial. Although the district court was not obligated to try defense counsel’s case, the court was not relieved of its duty to avoid glaring errors or to make independent inquiries to ensure that Shields received his right to a fair trial.
Specifically, the district court should have considered Shields’ mental retardation when it ruled on the motion to suppress. Shields freely admits that he received a Miranda warning and that he waived his rights before he provided his recorded statement to police. See Miranda v. Arizona, 384 U.S. 436, 444, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966). Howev *392 er, for better or worse, Miranda's now-familiar questions are an imperfect and approximate instrument for measuring the validity of a suspect’s waiver. Ultimately, whether a suspect validly waived his rights depends not only on whether the Miranda warning was properly given, but also on whether the waiver of the suspect’s Miranda rights was made “voluntarily, knowingly, and intelligently.” Id. at 444-45, 86 S.Ct. 1602.
This fact-sensitive inquiry has two distinct dimensions. Moran v. Burbine, 475 U.S. 412, 421, 106 S.Ct. 1135, 89 L.Ed.2d 410 (1986) (citing Edwards v. Arizona, 451 U.S. 477, 482, 101 S.Ct. 1880, 68 L.Ed.2d 378 (1981); Brewer v. Williams, 430 U.S. 387, 404, 97 S.Ct. 1232, 51 L.Ed.2d 424 (1977)). For a waiver to have been “voluntary,” it must have been “the product of a free and deliberate choice rather than intimidation, coercion, or deception.” Id. For the waiver to have been made “knowingly and intelligently,” it must have been made “with a full awareness of both the nature of the right being abandoned and the consequences of the decision to abandon it.” Id. “Only if the totality of the circumstances surrounding the interrogation reveal both an uncoerced choice and the requisite level of comprehension may a court properly conclude that the Miranda rights [were] waived.” Id. (citing Fare v. Michael C., 442 U.S. 707, 725, 99 S.Ct. 2560, 61 L.Ed.2d 197 (1979) (internal quotation marks and additional citations omitted)).
Defense counsel only addressed the issue of voluntariness with respect to the Miranda waiver, summarily arguing that Shields’ statement ought to be suppressed because “coercive police activity overbore his will.” After considering the testimony of the interrogating officers, the district court disagreed with defense counsel’s argument. It would appear that the district court correctly decided the issue of volun-tariness, inasmuch as no evidence was elicited to suggest that the officers deliberately intimidated, coerced, or deceived Shields into giving an involuntary statement. See Garner v. Mitchell, 557 F.3d 257, 274 (2009) (en banc) (Moore, J., dissenting).
However, the district court never reached the second part of the waiver inquiry. The court never asked whether Shields — with all his innate mental deficiencies — possessed “the maturity, intelligence, and competency to make a knowing and intelligent waiver.” Id. at 274. Despite the fact that the district court’s own earlier, detailed ruling strongly cast doubt on that issue, the court simply ignored Shields’ mental retardation and failed to take it into account for the purposes of the suppression motion.
The government would have us fault defense counsel for this omission, arguing that Shields waived the opportunity to raise the “knowing and intelligent” argument because counsel failed to make that contention before the district court. If so, the government only highlights for our attention a glaring ineffective assistance of counsel claim.
Regardless of what defense counsel did or did not argue, however, the district court’s inquiry should not have ended with respect to the officer’s conduct. Id. at 275-76. The waiver inquiry encompasses two distinct parts, which work conjunctively, are therefore indivisible, and must both be considered to determine whether a valid waiver was made. See id. at 275. Deciding the validity of a waiver based solely on police conduct, without regard for whether the defendant had the capacity to make a knowing and intelligent waiver, reads the second element out of the waiver inquiry, and is clearly out of line with established Supreme Court Miranda jurisprudence. Id. In any event, it is utterly perplexing that Shields’ mental retardation did not arise as a topic of concern during *393 the suppression hearing, whether spontaneously or by the court’s direction, given the obvious connection between Shields’ mental limitations and his capacity to make a knowing and intelligent waiver of his Miranda rights.
As the majority correctly points out, finding a defendant mentally retarded does not preclude him from validly waiving his Miranda rights. See Garner, 557 F.3d at 264-65 (Rogers, J., majority). However, the waiver inquiry is always fact-sensitive and dependent on the totality of the circumstances — even more so in a case like this one. Id In this instance, the evidence indicates that Shields lacks basic life skills, is easily manipulated, and operates largely outside the realm of common sense reasoning. Under such circumstances, Shields’ ability to mention Miranda by name is not necessarily indicative of his grasp of the charges against him or his understanding of the consequences of waiving his rights.[2] Unfortunately, this Court has no basis on which to evaluate Shields’ capacity to make a valid waiver, because the district court failed to make the necessary and reasonable inquiries required to address the waiver issue.
The district court also should have taken Shields’ mental limitations into account when Shields timely asked to wear street attire to his trial. Citing two prior cases from this Circuit, the majority reasons that the district court was not obligated to significantly delay proceedings to accommodate Shields’ last-minute request. See United States v. Brown, 367 F.3d 549, 553-54 (6th Cir.2004); United States v. Williams, 641 F.3d 758, 767 (6th Cir.2011). However, Brown and Williams are clearly distinguishable from the case before us, because neither of those cases involved a mentally retarded defendant.
By contrast, in this case the district court was thoroughly aware that Shields’ mental retardation may have rendered him slow to fully appreciate the nature and the seriousness of the proceedings, including the effects his prison clothes might have on the jury’s impartiality. Rather than accommodate Shields’ reasonable request, the district court instead offered the defense an even more limited option than was granted by the courts in Brown and Williams. The district court’s proposed solution — that Shields wear a sport coat over his prison uniform — was really no solution at all. The court’s limited offer was insufficient to protect Shields’ right to an impartial jury, particularly given that his request, though admittedly belated, was technically timely. Furthermore, there was no substance to the district court’s contention that permitting a short recess to allow Shields to change clothes would have significantly delayed the proceedings.
Finally, it is troubling that the escape charge was not severed from the rest of Shields’ trial. At best, the evidence elicited on the escape count was minimal. Shields’ attempted “escape” was childishly ill-planned and ill-thought out, which is perhaps unsurprising given his mental retardation. While awaiting trial on the kidnapping and murder charges, Shields was segregated in a high-security prison that allowed him one hour outdoors in an isolated pen housed within the prison’s recreation yard. Shields and a fellow inmate pried loose the wire fence of their segregation pens, but they were quickly apprehended clinging to the inner perimeter fence of the recreation yard. Even if Shields’ ineffective defense counsel unjustifiably waived its chance to request a sever- *394 anee of the escape charge, its facts were obviously weak and entirely tertiary to the other issues at trial. The district court should have been more vigilant in protecting Shields against the inclusion of this wholly unrelated, but highly prejudicial charge. At a minimum, some inquiry by the district court with respect to this issue would have been appropriate.
In any criminal trial, the presiding judge has an obligation to steward the proceedings in a manner that takes into account the full range of facts before the court and that steers clear of obvious violations of the defendant’s constitutional rights. I cannot agree that Shields received this consideration when the district court largely disregarded Shields’ mental deficiencies, shunted aside its own detailed factual findings with respect to Shields’ mental retardation, and failed to take into account the obvious inadequacies of the ineffective assistance defense counsel provided to the defendant. Accordingly, and for the reasons discussed above, I respectfully dissent.

. According to the Diagnostic and Statistical Manual of Mental Disorders (4th ed. — Text Revision) ("DSM-IV”), "significantly subaver-age intellectual functioning” is defined as an IQ of 70 or below.

. Of course, these findings also bear directly on the central factual dispute raised by the defense — whether it was Defendant’s cousin, Sonny Shields, who was primarily responsible for orchestrating the kidnapping and ultimately murdering Jerrell Lott.